**Diane KESSENICH, Plaintiff,**

v.

**Jeanne RAYNOR, Raynor Country Day School, Inc., Raynor Country Day School, Jeanne's Junior Jungle, Inc., John Adam Kanas and Patricia Blake, Defendants.**

**No. CV99–1253 (NGG)(WDW).**

United States District Court,
E.D. New York.

Nov. 13, 2000.

Creditor sued debtor, debtor's corporation, competing creditor and competing creditor's counsel. On plaintiff's motion for summary judgment, and defendants' motions to dismiss, the District Court, Garaufis, J., held that: (1) fact issue existed as to whether principal/surety relationship existed between creditor and debtor; (2) creditor state claim against competing creditor for imposition of constructive trust; (3) creditor state claim against competing creditor and counsel for tortious interference with contractual relations; and (4) creditor stated claim against corporation under theory of de facto merger.

Michael P. Manning P.C., New York City by Michael P. Manning, for Plaintiff.

Wickham, Wickham & Bressler, P.C., Melville, NY by Eric J. Bressler, for Defendants.

### MEMORANDUM AND ORDER

GARAUFIS, District Judge.

Before the Court are a motion to dismiss the complaint pursuant to Fed. R. Civ. P. 12(b)(6) brought by defendants John Adam Kanas ("Kanas"), Patricia Blake ("Blake"), Jeanne's Junior Jungle, Inc. ("JJJ"), and Raynor Country Day School ("RCDS"), and Plaintiff's cross-motion for partial summary judgment brought by Diane Kessenich ("Kessenich") against defendant Jeanne Raynor ("Raynor"). Prior to the reassignment of this case to the undersigned, these motions were referred to Magistrate Judge William D. Wall, who issued his report and recommendation (the "R & R") on July 20, 2000. Plaintiff and Defendants filed their respective objections to the R & R on August 14, 2000. On August 24, 2000 both Defendants and Plaintiff filed responses to each other's objections to the R & R. Having reviewed the parties' submissions on the motion to dismiss, the cross-motion for summary judgment, and in connection with the R & R, this court adopts Magistrate Judge

Wall's reasoning and conclusions, with certain modifications, as set forth below.

## I. FACTUAL BACKGROUND

Plaintiff's allegations in the Amended Complaint fall into two categories: (1) allegations relating to the loans made by Kessenich to defendants Raynor, JJJ, and RCDS (the "Kessenich Loans"); and (2) allegations relating to the security documents allegedly promised to Kessenich, which involve all of the Defendants (the "Kessenich Security Documents"). Plaintiff's cross-motion for summary judgment is based on the Kessenich Loans. Defendants' motion to dismiss is based on the Kessenich Security Documents. The facts are reported here as set forth in the Amended Complaint, and are given the requisite weight in the parties' respective motions, as discussed below.

### A. Kessenich's Initial Loans to Raynor and RCDS

#### 1) The EAB Credit Lines

Raynor and Kessenich met in 1994 when Kessenich's grandchild attended JJJ, which is a day care center operated by Raynor. In September, 1994 Raynor asked Kessenich to volunteer as a consultant to Raynor and JJJ.

By notice dated November 10, 1994 the Internal Revenue Service issued a levy on JJJ's bank account at European American Bank ("EAB"), and Raynor asked Kessenich to furnish collateral to EAB "in an amount sufficient for Raynor to obtain a loan from EAB to discharge the levy." (Amended Complaint ("Amend.Compl.") ¶ 17.)

Kessenich temporarily pledged a $25,000.00 EAB certificate of deposit, creating a $24,976.79 line of credit (the "EAB Credit Line"), and the levy was discharged with funds loaned to Raynor pursuant to that credit line. (Id. ¶¶ 18–19.) In late August, 1995 Kessenich substituted a zero coupon municipal bond as collateral for the

credit line in place of the certificate of deposit (the "Bond Collateral"). (Id. ¶ 20.)

Raynor and JJJ obtained an increase in the EAB Credit Line from $24,976.79 to $90,000.00 (the "Increased EAB Credit Line") in February, 1997 by representing to EAB that Kessenich had approved the application of the Bond Collateral to the Increased EAB Credit Line, despite the fact that Kessenich had not approved such an application. Raynor and JJJ later defaulted on the EAB Credit Line and the Increased EAB Credit Line, and in December, 1998 and January, 1999 falsely represented to EAB that Kessenich had approved the liquidation of the Bond Collateral to satisfy Raynor's balance on the Increased EAB Credit Line. In January, 1999 EAB liquidated the Bond Collateral, which resulted in proceeds of $137,042.10. Of that amount, $66,649.10 was paid in satisfaction of Raynor's obligation to EAB and $70,393.00 was returned to Kessenich. (Id. ¶¶ 50–55.)

#### 2) The $400,000.00 Escrow

In February, 1995 Raynor formed RCDS for the purpose of operating a pre-kindergarten and grade school with advice from Kessenich. Additional space was sought to accommodate the projected combined enrollment of RCDS and JJJ. This search gained urgency when proceedings were initiated to remove JJJ from the building in which it was then located, at 170 Montauk Highway in Speonk, New York. (Id. ¶¶ 21–24.)

In May, 1995 Raynor commenced negotiations with Alpert's Furniture, Inc. ("Alpert's") for a lease on property located at 145A Montauk Highway in Westhampton, New York (the "Leased Premises"). The resulting lease agreement included a provision requiring Raynor to furnish a bond or to place funds in escrow to secure her ability to make certain improvements to the property (the "Leasehold Improvements"). (Id. ¶¶ 25–29.) To raise money for the Leasehold Improvements, Raynor attempted to offer shares of JJJ and

RCDS in a private placement. The law firm retained by Raynor was unable, however, to complete the paperwork required in connection with the private placement in time to begin construction immediately following the end of the 1995–96 school year. Due to this delay, and in order to secure the funds required for the Leasehold Improvements, Raynor again sought and received financial assistance from Kessenich. (*Id.* ¶¶ 29–35.)

Kessenich delivered $400,000.00 to Raynor's attorney, J. Stewart McLaughlin ("McLaughlin") with the understanding that the money would be held in escrow to secure performance of the Leasehold Improvements (the "$400,000.00 Escrow"). Prior to delivery of the money, Raynor represented to Kessenich that the actual construction costs would be paid with the proceeds from the private placement, that the escrow funds were to be used only as collateral, and that the escrow funds would be secured with the assets of RCDS and Raynor's personal assets. With the $400,000.00 Escrow in place, Alpert's and RCDS entered into a lease dated August 1, 1996 (the "Alpert's Lease"). (*Id.* ¶¶ 30–36.)

## B. The Construction Loans

### 1) The $350,000.00 Construction Loan

Between August, 1996 and May, 1997 Raynor asked Kessenich several times for more money, claiming that the funds were needed to meet payroll expenses and to prevent the delay of the new school's opening, and that the $400,000.00 Escrow could not be used for these purposes. Once again, Kessenich provided funds. Between August 9, 1996 and September 26, 1996 Kessenich made a series of so-called "construction loans" to pay for improvements to the Leased Premises. These loans, totaling $350,000.00, were made by wire transfers from Kessenich to RCDS's account at North Fork Bank (the "$350,-000.00 Construction Loans"). (*Id.* ¶¶ 37–39.) On or about October 7, 1996 Raynor and RCDS executed and delivered a de-

mand promissory note in the amount of $350,000.00 in regard to the $350,000.00 Construction Loans (the "First ($350,-000.00) Promissory Note"). (*Id.* ¶ 40.)

### 2) The $98,000.00 Construction Loan

Kessenich continued to extend loans. On October 9, 1996 she made a wire transfer of $98,000.00 to RCDS's account (the "$98,000.00 Construction Loan"). Meanwhile, McLaughlin disbursed $269,625.77 from the $400,00.00 Escrow (the "$269,-625.77 Loan") without Kessenich's knowledge or permission. Raynor and RCDS executed and delivered a second demand promissory note in the amount of $717,625.77 to evidence their indebtedness for the $350,000.00 Construction Loan, the $98,000.00 Construction Loan, and the $269,625.77 Loan (the "Second ($717,-625.77) Promissory Note"). (*Id.* ¶¶ 41–43.)

### 3) The $10,000 & $26,000 Loans

On January 9, 1997 an additional $10,000.00 was disbursed by McLaughlin from the $400,000.00 Escrow, and in May, 1997 Kessenich loaned an additional $26,000.00 to Raynor and RCDS (the "$10,000.00 Loan" and the "$26,000.00 Loan"). Raynor and RCDS executed and delivered yet another demand promissory note in the amount of $26,000.00 (the "Third ($26,000.00) Promissory Note") and Raynor again agreed to execute and deliver additional "security instruments," to be drawn up by a lawyer whom Kessenich would hire. (*Id.* ¶¶ 44–48.)

## C. The "Security Instruments"

### 1) The Promised Security

Kessenich alleges that she made all of these financial accommodations to Raynor because she and Raynor enjoyed a confidential and fiduciary relationship and because Raynor promised, "directly, and by implication, to pledge her interest in JJJ and RCDS Inc. and RCDS Inc.'s interest in the Alpert lease to Kessenich as security" for the loans. (*Id.* ¶¶ 81–82.)

Throughout 1996 Raynor and McLaughlin agreed to prepare, but never actually delivered, documents relating to the promised security. In April, 1997 Kessenich hired John Schnaufer, an attorney, to prepare the debt and security agreements. At this time, Raynor reaffirmed her promises that:

1) RCDS would execute a leasehold mortgage assigning and mortgaging its interest in the Alpert's lease to Kessenich;

2) Raynor would pledge all her stock in JJJ and RCDS to Kessenich and execute UCC–1 financing statements in connection therewith;

3) RCDS would assign all rents to which it was entitled as a result of the Alpert's Lease, including rents RCDS received from JJJ Corp.;

4) RCDS and JJJ would grant security interests in all personal property owned by them and used at the schools, and execute certain UCC financing statements in this regard;

5) RCDS would assign to Kessenich the option, granted in the Alpert's Lease, to purchase the Leased Premises and an adjacent parcel.

(*Id.* ¶ 83.)

Based on these promises and the information provided by Raynor and McLaughlin, Schnaufer drew up the Kessenich Security Documents. Schnaufer sent the Kessenich Security Documents to Raynor and McLaughlin on July 24, 1997. Raynor and McLaughlin reviewed these documents, which they "approved and agreed upon in each and every particular." (*Id.* ¶ 83.)

## 2) Involvement of Defendants Kanas and Blake

In August, 1997 Raynor told Kessenich that she had spoken to Kanas, who was interested in sending his son to RCDS, and that Kanas wished to meet with Kessenich.[1] Kanas, Blake, Plaintiff and Schnaufer met on August 15, 1997 at Kanas's office at North Fork Bancorporation. Blake served both as in-house counsel for North Fork and as Kanas's personal attorney. Kanas demonstrated familiarity with the Kessenich Security Documents during the meeting. After about two hours, during which time Kanas, Blake, Plaintiff and Schnaufer had been discussing RCDS and Kessenich's involvement with RCDS, Raynor was called into the meeting. Kanas then advised Raynor that she should execute and deliver the Kessenich Security Documents. Kanas also stated that he was providing Blake's legal services to Raynor and RCDS at no cost. (*Id.* ¶¶ 84–89.)

Following this meeting, Plaintiff and her attorney attempted on numerous occasions to obtain the Kessenich Security Documents from Raynor and Blake. In response to these efforts, Raynor stated at least twice that she had signed the documents and given them to Blake; Raynor further stated that she would either obtain the Kessenich Security Documents from Blake and send them to Kessenich, or would instruct Blake or Kanas to send them. (*Id.* ¶¶ 91.)

On or about September 8, 1997 Blake informed Schnaufer that she would not deliver the Kessenich Security Documents as promised because "Kanas had instructed Blake not to do so until Kanas approved terms for the repayment of the Kessenich loans." (*Id.* ¶¶ 90–92.)

On or about the same date, Kessenich demanded that Kanas stop interfering with the repayment of the loans and the delivery of the Kessenich Security Documents. During this conversation "Kanas revealed that he was attempting to purchase the Leased Premises from Alperts (notwithstanding that Kanas knew that an assignment of the option to purchase the parcel was part of the security included in the

---

1. Although Kanas is identified in the Amended Complaint as "the chairman, chief executive officer and president of North Fork Bancorporation," (*id.* ¶ 84), Plaintiff's claims are alleged only against Kanas in his individual capacity.

Kessenich Security Documents) and stated that he would deliver the documents in 'four days.'" (*Id.* ¶ 93.) The documents were never delivered, and Kanas did not purchase the Leased Premises. (*Id.* ¶ 94.)

During this period, Kanas allegedly exerted "economic pressure" on Raynor to prevent her from delivering the Kessenich Security Documents because he wanted to obtain priority on the secured collateral that had been promised to Kessenich. On or about September 22, 1997 Kanas loaned RCDS, JJJ and Raynor $153,000.00 (the "Kanas Loan"), receiving in return the collateral and security that Raynor had "long promised" to Kessenich. (*Id.* ¶¶ 96–97.) The Kanas Loan documents include a "Negative Pledge Agreement" prohibiting Raynor, JJJ and RCDS from executing and delivering the Kessenich Security Documents. (*Id.* ¶ 98.) Kanas allegedly also induced Raynor to terminate the Alpert's Lease, "an act that would have required Kessenich's consent under the Kessenich Security Documents." (*Id.* ¶ 100.)

On October 8, 1998 Kanas directed the filing of a certificate of dissolution by RCDS, Inc. following the incorporation of Raynor Country Day School II ("RCDS II"). Furthermore, "Kanas ... obtained the equivalent security to the Kanas Loan from RCDS II as had been obtained [by Kessenich] from RCDS Inc. (the predecessor-in-interest to RCDS II)." (*Id.* ¶ 101–02.) The dissolution of RCDS followed Blake's negotiation, at Kanas' direction, of a one-year lease of the Leased Premises for RCDS II as tenant, which was executed on September 18, 1998. Plaintiff contends that Kanas instructed Raynor to move RCDS II, upon expiration of the Second Alpert's Lease, along with JJJ to JJJ's previous location in Speonk, New York. (*Id.* ¶ 103.)

## II. DISCUSSION

### A. Plaintiff's Motion for Partial Summary Judgment

Plaintiff seeks summary judgment against Raynor on the first, third, fourth, fifth, sixth, seventh, ninth and tenth claims in the Amended Complaint, and seeks an order striking the Answer. Raynor's opposition to Plaintiff's motion consists only of a four paragraph Reply Affirmation in Opposition to Cross–Motion for Summary Judgment ("Raynor Reply Affirm.") submitted by her attorney, Eric J. Bressler, and a counterstatement pursuant to Rule 56.1(b) of the Rules of the U.S. District Courts for the Southern and Eastern Districts of New York (the "Raynor 56.1(b) Stmt."). Raynor did not submit a memorandum of law in opposition to Plaintiff's motion. Such a failure to comply with Local Civil Rule 7.1 has been deemed "sufficient cause for the granting of a motion [by default.]" *See Wenzhou Wanli Food Co., Ltd. v. Hop Chong Trading Co., Inc.,* No. 98–CIV–5045 (JFK), 2000 WL 964944, at *3 (S.D.N.Y. July 11, 2000). In the interests of justice, however, this court declines to grant the motion by default. Raynor is cautioned to comply with all applicable rules in the future.

Although Raynor contends that Plaintiff's third through seventh, ninth and tenth claims are duplicative, she concedes that "under the third through seventh claims there is only due the aggregate amount of $717,625.77." (Raynor Reply Affirm. ¶ 4.) There is no basis upon which this court could conclude that a material issue of fact exists with respect to Raynor's indebtedness to Kessenich, which Raynor does not contest. Raynor further concedes liability under Plaintiff's ninth and tenth claims by failing to oppose them. Raynor does, however, oppose Plaintiff's first claim for summary judgment, as discussed below.

" 'Summary judgment is appropriate where there are no genuine disputes concerning any material facts, and where the moving party is entitled to judgment as a matter of law.'" *Jamaica Ash & Rubbish Removal Co. v. Ferguson,* 85 F.Supp.2d 174, 180 (E.D.N.Y.2000) (quoting *In re Blackwood Assocs., L.P.,* 153 F.3d 61, 67

(2d Cir.1998) and citing FED. R. CIV. P. 56(c) and *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). In deciding a summary judgment motion, the district court must resolve all ambiguities and draw all reasonable inferences in the light most favorable to the opposing party. *See Castle Rock Entertainment, Inc. v. Carol Publishing Group, Inc.,* 150 F.3d 132, 137 (2d Cir.1998). If there is evidence in the record as to any material fact from which an inference could be drawn in favor of the non-movant, summary judgment is unavailable. *See Holt v. KMI–Continental, Inc.,* 95 F.3d 123, 128 (2d Cir.1996), *cert. denied,* 520 U.S. 1228, 117 S.Ct. 1819, 137 L.Ed.2d 1027 (1997).

The trial court's responsibility is "limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *B.F. Goodrich v. Betkoski,* 99 F.3d 505, 522 (2d Cir.1996) (internal quotation omitted). When, however, there is nothing more than a "metaphysical doubt as to the material facts," summary judgment is proper. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "Rather, there must exist 'specific facts showing that there is a genuine issue for trial' in order to deny summary judgment as to a particular claim." *Jamaica Ash,* 85 F.Supp.2d at 180 (quoting *Celotex,* 477 U.S. at 322, 106 S.Ct. 2548)).

All of the claims on which plaintiff seeks summary judgment concern the loans made by Kessenich to Raynor in 1996 and 1997. These include:

1) the $66,649.10 loan based on the EAB Credit Line, the Increased EAB Credit Line and the liquidation of the Bond Collateral (first and second claims);

2) the $350,000.00 Construction Loan and the First ($350,000.00) Promissory Note (third and fourth claims);

3) the $98,000.00 Construction Loan (fifth claim);

4) the $269,625.77 Loan (sixth claim);

5) the Second ($717,625.77) Promissory Note executed in connection with the $350,000.00 Loan, the $98,000.00 Loan and the $269,625.77 Construction Loan (seventh claim);

6) the $26,000.00 Loan and the Third ($26,000.00) Promissory Note (ninth and tenth claims).[2]

As noted above, Raynor does not contest that she owes Plaintiff $717,625.77. (Raynor Reply Affirm. ¶ 2.) Raynor secured this indebtedness by means of a demand promissory note, dated March 4, 1997.[3] (Kessenich Affidavit in Support of Plaintiff's Cross Motion for Summary Judgment (the "Kessenich Aff.") Ex. Q.) Demand was made by Kessenich on October 30, 1998. (*Id.* Ex. V.) Pursuant to the terms of the promissory note, Kessenich is also entitled to 5% of the amount of the overdue payment, or $35,881.29. The promissory note also provides that "reasonable attorney's fees and costs shall also be paid in addition to the principal indebtedness in the event any legal action is necessary to enforce this instrument." (*Id.* Ex. Q.) Raynor does not deny the validity of the various promissory notes; neither does she oppose the application of the terms of those notes. Summary Judgment is thus warranted on Plaintiff's third, fourth, fifth, sixth and seventh claims in the principal amount of $717,625.77 plus an additional penalty of $35,881.29, with interest, costs and reasonable attorney's fees.

---

**2.** Plaintiff does not seek summary judgment on her eighth claim, which is based upon the $10,000.00 Loan.

**3.** The promissory note is actually in the amount of $717,625.27, not $717,625.77. Because the defendant has conceded indebtedness for the additional fifty cents, the higher number will be included in the calculation of damages.

Nor does Raynor oppose Plaintiff's claim on the $26,000.00 Loan, which is secured by the Third ($26,000.00) Promissory Note. (*Id.* Ex. U.) In her Answer to the Amended Complaint Raynor admits both her indebtedness for the $26,000.00 Loan and the execution and delivery of a promissory note for the amount of that loan.[4] (Answer ¶¶ 45, 48 & 75.) Raynor is bound by these admissions. *See Western World Ins. Co. v. Stack Oil, Inc.*, 922 F.2d 118, 122 (2d Cir.1990) (holding that admission in answer is a "formal judicial admission" conclusive against defendant in motion for summary judgment); *see also Insurance Co. of North America, Inc. v. Guinan*, No. 87–C–1327, 1988 WL 119144, at *2 n. 3 (N.D.Ill. Oct.31, 1988), *aff'd*, 909 F.2d 1486 (7th Cir.1990) (holding that the court would treat admissions in answer as binding on motion for summary judgment and would regard admissions as facts as to which there is no genuine dispute). Demand for payment on the note was made on Oct. 30, 1998. (Kessenich Aff. Ex. V.) Thus, summary judgment is also granted on claims nine and ten in the principal amount of $26,000.00, along with a 5% penalty in the amount of $1,300.00 pursuant to the terms of the Third ($26,000.00) Promissory Note, plus attorney's fees and costs. (*Id.* Ex. U.)

Raynor opposes the motion for summary judgment on the first claim, which involves the Increased EAB Credit Line. Kessenich argues that she guaranteed and provided collateral in an amount sufficient for Raynor to obtain two loans from EAB in September and December, 1994, that Raynor admits the loans and Kessenich's deposit of the Bond Collateral therefor, (Answer ¶¶ 19–20), and that a principal-surety relationship was thus created with Kessenich as the surety. (*See* Plaintiff's Memorandum of Law in Support of Motion for Summary Judgment ("Pl.'s Summ. J. Mem.") at 14–15.) Plaintiff further argues that because Raynor, the principal obligor, defaulted on the loans, Kessenich is equitably entitled to full indemnity of the default. (*Id.* at 15.)

Raynor contends that there are material issues of fact to be tried in regard to the first claim. The first allegedly disputed material fact is: "[w]hether Kessenich pledged a $50,000 certificate of deposit to EAB in connection with a line of credit extended to Jeanne's Junior Jungle, Inc. and granted by Raynor." (Raynor's 56.1(b) Stmt. ¶ 1.) The conflicting references to a $50,000.00 certificate of deposit in both Plaintiff's and Defendant's papers (and in Plaintiff's Exhibit C) may appear somewhat confusing; the Amended Complaint alleges no facts, for example, regarding the $50,000.00 certificate of deposit, alleging instead the pledge of a $25,000.00 certificate of deposit. The certificates of deposit are not, however, material to the dispute. Whatever the amount of the certificate (or certificates) originally pledged, Plaintiff later substituted the Bond Collateral as security, and it is the Bond Collateral and its liquidation that lie at the heart of Plaintiff's claim.

Raynor next asserts that it is disputed "[w]hether on [August][5] 29, 1995 Kessenich deli[vered] substitute collateral for the $50,000 line of credit." (*Id.* ¶ 2.) Raynor concedes delivery, however. Plaintiff alleges that "Kessenich delivered a zero coupon municipal bond … due 10/01/2012 … as collateral for the EAB Credit Line in place of $25,000 Certificate of Deposit." (Amend.Compl.¶ 20.) In her Answer, Raynor pleads: "Admits the allegations set

---

**4.** Paragraph 75 of Raynor's Answer to Amended Complaint actually states "Admits the allegations set forth in paragraph 75 of the Complaint only as to Jeanne Pohorelsky." Presumably, the attorney's mind had wandered to the Magistrate Judge formerly assigned to this case, and the admission should read "Jeanne Raynor." In any event, the

admissions in paragraphs 45 and 48 are sufficient.

**5.** Raynor actually refers to April 29, 1995, but the complaint and the plaintiff's Rule 56.1 Statement both state August 29, 1995 as the relevant date. Raynor presumably intended to refer to August.

forth in paragraph 20 of the Complaint." (Answer at 20.) Raynor is bound by her admission that the Bond Collateral was delivered. *See Western World*, 922 F.2d at 122.

Finally, Raynor attempts to establish a disputed issue of material fact that would defeat summary judgment on Plaintiff's first claim by calling into doubt "[w]hether Raynor refinanced the line of credit and loan in February, 1997 without Kessenich's knowledge or approval." (Raynor's 56.1(b) Stmt. ¶ 3.) It is disputed whether Kessenich knew of an approved the refinancing, and also whether the documentary evidence shows that the Increased EAB Credit Line was a refinancing of the earlier line of credit. Neither dispute, however, rises to the level of materiality required to defeat Kessenich's cross-motion. A $90,000.00 Business Credit Account was extended to JJJ in February, 1997; Raynor was the guarantor of that loan; JJJ defaulted on the loan; Kessenich's "hypothecated stock," held as collateral on the loan, was liquidated to cover the default, yielding total proceeds of $137,042.10; and $66,649.10 of the liquidated funds was used to cover the default. (Kessenich Aff. Exs. W–AA.) Raynor disputes none of these facts.

■ Although Raynor has failed to come forward with any disputed issue of material fact to bar summary judgment on the first claim, Plaintiff cannot prevail on this claim because she has failed to show that she is entitled to judgment as a matter of law. Kessenich argues that the relationship between Raynor and Kessenich with respect to the EAB credit lines was one of principal and surety, and that Kessenich, as surety, is equitably entitled to full indemnity on the default. (Pl.'s Summ. J. Mem. at 15.) Although the definition of suretyship relied on by Kessenich lends superficial support to her claim, Kessenich offers no further legal argument in support of her surety/principal theory. Suretyship is a contractual relation. *See* 63 N.Y. JUR. 2D § 5. For the purposes of

summary judgment, however, Kessenich has not provided this court with an adequate basis upon which to conclude that a contract existed between herself and Raynor in connection with this transaction. Plaintiff's first claim in the Amended Complaint states only that "Raynor owes Kessenich $66,649.10 for money lent pursuant to the EAB Credit Line and/or the Increased EAB Credit Line plus interest." (Amend.Compl.¶ 55.) Plaintiff does not allege a surety contract. On its merits, therefore, Kessenich's argument that a surety/principal relationship existed between herself and Raynor must fail.

■ Furthermore, suretyship contracts must be in writing. *See* N.Y. GEN. OBLIG. L. § 5–701 (McKinney's 1989); *Posner v. Minnesota Mining & Mfg. Co.*, 713 F.Supp. 562, 563–64 (E.D.N.Y.1989) (holding that where plaintiff's complaint referred to an "oral suretyship agreement with defendant," the complaint showed the cause of action was barred by the Statute of Frauds and plaintiff was not allowed to replead). New York's Statute of Frauds requires that: "a. Every agreement, promise or undertaking is void, unless it or some note or memorandum thereof be in writing, and subscribed by the party to be charged therewith . . . if such agreement, promise or undertaking: . . . 2. is a special promise to answer for the debt, default or miscarriage of another person." N.Y. GEN. OBLIG. L. § 5–701(a)(2). Thus, if the agreement between Kessenich and Raynor is a suretyship, recovery is defeated by the application of the Statute of Frauds, inasmuch as Plaintiff has not produced a written contract in support of her cross-motion.

■ Generally, a defendant is obliged to raise the Statute of Frauds in the Answer or be deemed to have waived it. *See* FED. R. CIV. P. 8(c); *see also AM Cosmetics Inc. v. Solomon*, 67 F.Supp.2d 312, 319 (S.D.N.Y.1999) (holding that defendants had failed to plead Statute of Frauds in their answer and thus defense was

waived). Although Raynor did not raise the Statute of Frauds as an affirmative defense in her Answer or in opposition to the motion, because Kessenich did not allege a suretyship contract, Raynor's failure does not amount to waiver. *See Window Headquarters, Inc. v. MAI Basic Four, Inc.*, Nos. 91–Civ.1816 (MBM), 92–Civ.–5283 (MBM), 1993 WL 312899, at \*3 (S.D.N.Y. Aug.12, 1993) (explaining that where plaintiff failed to assert whether contract was oral or written, defendant "cannot know whether to plead affirmative defenses based on ... [the] statute of frauds") (quoting *Marquardt–Glenn Corp. v. Lumelite Corp.*, 11 F.R.D. 175, 177 (S.D.N.Y. 1951)). Kessenich's surety argument is thus also barred by the statute of frauds.

## B. Motion to Dismiss

Defendants Kanas, Blake, JJJ and RCDS move to dismiss the Amended Complaint for failure to state a claim. For purposes of a motion to dismiss, the court deems all facts alleged in the Amended Complaint as true, "and draw[s] inferences from those allegations in the light most favorable to the plaintiff." *Dew v. United States*, 192 F.3d 366, 371 (2d Cir.1999), *cert. denied*, —— U.S. ——, 120 S.Ct. 1554, 146 L.Ed.2d 460 (2000); *see also H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 249–50, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989). A complaint may be dismissed only where "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957) (footnote omitted); *see also Northrop v. Hoffman of Simsbury, Inc.*, 134 F.3d 41, 44 (2d Cir.1997).

This court's inquiry is limited at this stage to the facts in the complaint or in documents attached to the complaint. *See Newman & Schwartz v. Asplundh Tree Expert Co.*, 102 F.3d 660, 662 (2d Cir. 1996). In addition, the question is not whether plaintiff will prevail, but rather " 'whether the claimant is entitled to offer evidence to support the claims.' " *Arizona Premium Fin., Inc. v. Bielli*, 77 F.Supp.2d 341, 345 (E.D.N.Y.1999) (quoting *Villager Pond, Inc. v. Town of Darien*, 56 F.3d 375, 378 (2d Cir.1995)). Rule 8(a) requires only " 'a short and plain statement of the claim' that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley*, 355 U.S. at 47, 78 S.Ct. 99 (quoting FED. R. CIV. P. 8(a)).

### 1) Claims against Kanas

The Amended Complaint asserts three claims against Kanas: 1) imposition of a constructive trust and/or equitable lien on certain security given to Kanas by Raynor in connection with the Kanas loan; 2) equitable subordination of the security documents prepared in connection with the Kanas loan; and 3) interference with existing and prospective contractual relations between Kessenich and Raynor, JJJ, RCDS and RCDS II. Plaintiff has adequately pled each of these claims.

### a) Imposition of a Constructive Trust

Kanas argues for the dismissal of the twelfth claim in the Amended Complaint, which seeks the imposition of a constructive trust on the various assets that make up the security package promised by Raynor to Kessenich but ultimately pledged to Kanas, on the ground that the elements of a constructive trust are not present in the relationship between Kessenich and Kanas. Although Kanas properly cites the constructive trust elements under New York law, he misapplies the teaching of these cases.

In determining whether to grant the equitable remedy of a constructive trust, New York courts often consider four factors: (1) a confidential or fiduciary relationship; (2) a promise, express or implied; (3) a transfer in reliance thereon; and (4) unjust enrichment. *See, e.g., Crown Realty Co. v. Crown Heights Jewish Community Council*, 175 A.D.2d 151, 572 N.Y.S.2d 38, 38 (2d Dept. 1991) (citing *Sharp v.*

*Kosmalski,* 40 N.Y.2d 119, 121, 386 N.Y.S.2d 72, 351 N.E.2d 721 (1976)). The Second Circuit has noted that although these factors are " 'useful in many cases, constructive trust doctrine is not rigidly limited' " by their application. *Golden Budha Corp. v. Canadian Land Co. of America, N.V.,* 931 F.2d 196, 202 (2d Cir.1991) (quoting *Simonds v. Simonds,* 45 N.Y.2d 233, 241, 408 N.Y.S.2d 359, 380 N.E.2d 189 (1978)).

As Justice Cardozo put it, "[a] constructive trust is the formula through which the conscience of equity finds expression. When property has been acquired in such circumstances that the holder of the legal title may not in good conscience retain the beneficial interest, equity converts him into a trustee." *Beatty v. Guggenheim Exploration Co.,* 225 N.Y. 380, 386, 122 N.E. 378 (1919); *see also Simonds,* 45 N.Y.2d at 242, 408 N.Y.S.2d 359, 380 N.E.2d 189 (1978) (holding that all that is generally required for imposition of a constructive trust "is that a party hold property under such circumstances that in equity and good conscience, he ought not to retain it") (internal quotation omitted).

■ These equitable principles apply on a motion to dismiss. "In pleading as in proof, a constructive trust is a flexible device and must not be bound by an 'unyielding formula.' " *Golden Budha,* 931 F.2d at 202 (quoting *Beatty,* 225 N.Y. at 389, 122 N.E. 378). In *Golden Budha,* the Second Circuit vacated the district court's dismissal of a constructive trust claim, where it appeared from the complaint that defendants held property they should not retain, in good conscience and equity, even where the district court had found three of the four constructive trust elements lacking. *See id.* at 202. The same result should obtain here. Construing the allegations against Kanas in the light most favorable to Kessenich, as we must, she has met her burden of alleging circumstances under which Kanas should not, in good conscience and equity, retain the property. Kanas's argument that one or more of the

equitable trust factors is missing from the Kanas/Kessenich relationship ignores the broad application of constructive trust doctrine. "[A] constructive trust will be erected wherever necessary to satisfy the demands of justice ... Its application is limited only by the inventiveness of men who find new ways to enrich themselves unjustly by grasping what should not belong to them." *United States v. Incorporated Village of Island Park,* 888 F.Supp. 419, 455 (E.D.N.Y.1995) (quoting *Simonds,* 45 N.Y.2d at 241, 408 N.Y.S.2d 359, 380 N.E.2d 189 (1978) (internal quotation omitted)). Thus, Defendants' motion to dismiss the twelfth claim in the Amended Complaint for imposition of a constructive trust on the security documents held by Kanas is denied.

The twelfth claim asserts the imposition of an equitable lien as an alternative theory of recovery. The defendants do not address that theory in their motion papers, nor do they present any argument as to why the claim should be dismissed on that ground. Therefore, Defendants' motion to dismiss Plaintiff's twelfth claim, to the extent it seeks the imposition of an equitable lien, is denied.

### b) Claim for Equitable Subordination

The thirteenth claim in the Amended Complaint seeks equitable subordination of the "liens, security and collateral" held by Kanas. (Amend.Compl.¶ 108.) In her Memorandum of Law in Opposition to Motion to Dismiss ("Pl.'s Mem. Opp."), Kessenich concedes that "the thirteenth claim may be duplicative of the relief sought in the twelfth for imposition of a constructive trust and equitable lien." (Pl.'s Mem. Opp. at 9.) The Thirteenth Claim in the Amended Complaint is thus dismissed.

### c) Claim for Tortious Interference

■ Plaintiff's fourteenth claim asserts that Kanas and Blake "wrongfully, knowingly, intentionally, maliciously and by use of economic pressure, interfered with existing and prospective contractual relations

between Kessenich and Raynor, JJJ Corp., RCDS Inc. and RCDS II." (Amend. Compl.¶ 111.) The Amended Complaint sufficiently alleges the elements for a claim of tortious interference with contractual relations under New York law: "(1) the existence of a contract between plaintiff and a third party; (2) defendant's knowledge of the contract; (3) defendant's intentional inducement of the third party to breach or otherwise render performance impossible; and (4) damages to plaintiff." *Kronos, Inc. v. AVX Corp.*, 81 N.Y.2d 90, 94, 595 N.Y.S.2d 931, 612 N.E.2d 289 (1993)).

■ Kessenich first alleges the existence of an oral contract between herself and Raynor wherein Raynor promised to secure loans from Kessenich with Raynor's own assets and the assets of RCDS. (Amend.Compl.¶ 33.) Other factual allegations in the Amended Complaint, even if they are not express assertions of a contract, may be construed on this motion to dismiss as facts that, if true, would allow the plaintiff to prove the existence of a contract at trial.[6] Generally, the complaint alleges that Kessenich agreed to loan Raynor money, and Raynor agreed in return to pledge certain assets to Kessenich. Security documents were drawn up and signed by Raynor. (*Id.* ¶ 91.) All that was lacking was the promised delivery of the security documents to Kessenich. (*Id.* ¶¶ 83–91.)

Kessenich also sufficiently pleads the second element, i.e., that Kanas knew about the contract. The complaint alleges that Kanas referred to the Kessenich Security Documents at the meeting on August 15, 1997 and that Blake told Kessenich's attorney that Kanas had forbidden the delivery of the security documents. (*Id.* ¶¶ 87, 92.) The third element, that Kanas intentionally induced Raynor's breach, is also adequately pled. The complaint states that Kanas conspired with Blake and Raynor to deprive Kessenich of the secured collateral, in breach of Raynor's promise to Kessenich to deliver it. (*Id.* ¶ 95.) The complaint also alleges that Kanas was aware of the option to purchase the Leased Premises and knew that the option was part of the security package, but nonetheless attempted to purchase the premises himself. (*Id.* ¶ 93.) There is no contention that Kessenich has not adequately pled the fourth element—damages. Thus, Kessenich has met her pleading burden on the claim of tortious interference by Kanas, and dismissal of that claim is denied.

### 2) Tortious Interference Claim Against Blake

■ As discussed *supra*, Kessenich has adequately pled two of the elements of tortious interference, i.e., the existence of a valid contract and damages. The complaint alleges that Blake acted as Raynor's attorney, and that Raynor instructed her to deliver the Kessenich Security Documents to Plaintiff. (Amend.Compl.¶ 91.) Plaintiff's allegations concerning Blake's knowledge of the security documents and Raynor's express instruction that Blake deliver them to Kessenich satisfy the knowledge requirement. Plaintiff further alleges that "Blake[,] while holding herself out to Raynor as her lawyer, in fact acted on behalf of and at the direction of Kanas, and thereby wrongfully, knowingly, intentionally and maliciously interfered with the repayment of the Kessenich loans and the execution and delivery of the Kessenich Security documents." (*Id.* ¶¶ 91.) Thus, the pleading requirement for the inducement element is also satisfied.

Blake argues that to the extent that she was acting as an attorney for Raynor, she cannot be held liable for tortious interference, "since an attorney is not liable for inducing her client to breach a contract with a third party." (Defendants' Memo-

---

**6.** It should be noted that the allegation of an oral contract regarding the Security Documents is a separate issue from the "surety-ship" contract, or lack thereof, discussed *supra*.

randum of Law in Support of Motion to Dismiss Amended Complaint ("Defs.' Mem. in Supp.") at 3 (citing *Kartiganer Assocs. v. Town of New Windsor*, 108 A.D.2d 898, 485 N.Y.S.2d 782, 783 (N.Y.App.Div.1985)).) Blake also argues that, to the extent she was acting as Kanas's attorney, she cannot be held liable for tortious interference, "since an attorney is not liable to third parties for purported injury caused by services performed on behalf of a client or advice afforded to the client." *Id.* (citing *Burger v. Brookhaven Med. Arts Bldg., Inc.*, 131 A.D.2d 622, 516 N.Y.S.2d 705, 707 (N.Y.App.Div.1987)). Neither argument succeeds.

Relying on the general rule set forth in *Kartiganer* that an agent cannot be held liable for inducing her principal to breach a contract with a third person where he is acting on behalf of his principal and within the scope of his authority, *see Kartiganer*, 485 N.Y.S.2d at 783, Blake argues that because the complaint does not allege that Blake acted contrary to Raynor's instructions, the general rule applies. Blake reads the complaint too narrowly for the purposes of this motion. Deeming all facts alleged in the complaint as true, and drawing all inferences from those allegations in the light most favorable to the plaintiff, the complaint alleges acts that take Blake outside the general rule.

The Second Circuit has noted that "[u]nder New York law an attorney generally cannot be held liable to third parties for actions taken in furtherance of his role as counsel unless it is shown that he 'did something either tortious in character or beyond the scope of his honorable employment.'" *Newburger, Loeb & Co. v. Gross*, 563 F.2d 1057, 1080 (2d Cir.1977) (quoting *Dallas v. Fassnacht*, 42 N.Y.S.2d 415, 418 (N.Y.Sup.Ct.1943)). The allegations against Blake clearly indicate that, if true, Blake's actions were "beyond the scope of [her] honorable employment." Plaintiff's tortious interference claim against Blake hinges on the allegation that Blake, whose

legal services Kanas instructed Blake to provide free of charge, either: (1) induced Raynor to breach her promise to Kessenich to deliver the security documents, despite her knowledge of Raynor's agreement to do so, because she was placing Kanas' interests before those of her putative client; or (2) disregarded Raynor's instructions to deliver the documents, in the interests of Kanas and Blake herself, who wanted to protect her employment as attorney for North Fork Bank and for Kanas personally. Under either scenario, Kessenich may be able to prove that Blake is liable for tortious interference, despite the fact that she is an attorney. "While an attorney is privileged to give honest advice, even if erroneous, and generally is not responsible for the motives of his clients, admission to the bar does not create a license to act maliciously, fraudulently, or knowingly to tread upon the legal rights of others." *Newburger, Loeb*, 563 F.2d at 1080 (citations omitted). The motion to dismiss the fourteenth claim as against Patricia Blake is thus denied.

### 3) Unjust Enrichment Claim Against JJJ

■ The eleventh claim in the Amended Complaint asserts that Jeanne's Junior Jungle, Inc. has been unjustly enriched. JJJ seeks to dismiss the claim, arguing that the complaint does not allege the "three elements" of unjust enrichment: (1) enrichment of the defendant; (2) at the expense of plaintiff; (3) which in equity defendant should not retain. (Defs.' Mem. in Supp. p. 5 (citing *Ptachewich v. Ptachewich*, 96 A.D.2d 582, 465 N.Y.S.2d 277 (N.Y.App.Div.1983)).)

The equitable principles underlying the doctrine of unjust enrichment are similar to those underlying the doctrine of constructive trust, discussed *supra*. "A person may be deemed to unjustly enriched if he (or she) has received a benefit, the retention of which would be unjust .... A conclusion that one has been unjustly enriched is essentially a legal inference

drawn from the circumstances surrounding the transfer of property and the relationship of the parties. It is a conclusion reached through the application of principles of equity." *Sharp v. Kosmalski,* 40 N.Y.2d 119, 123, 386 N.Y.S.2d 72, 351 N.E.2d 721 (1976) (internal citation omitted). The Amended Complaint includes no basis for inferring that Kessenich effected any transfer to JJJ.

■ Kessenich argues that allegations in the complaint "support the proposition that Raynor applied certain proceeds for the benefit of JJJ Corp.... [and] an unjust enrichment claim lies under these circumstances." (Pl.'s Mem. Opp. p. 24.) Plaintiff does not, however, identify specific allegations sufficient to support her claim, nor do the reasonable inferences to be drawn from the complaint suffice. "[A] complaint ... must contain either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory," and the Amended Complaint does not meet that standard as to the unjust enrichment claim against JJJ. *Connolly v. Havens,* 763 F.Supp. 6, 9 (S.D.N.Y.1991).

Plaintiff is correct in arguing that the Kessenich affidavit submitted in support of Plaintiff's cross-motion for summary judgment and the exhibits annexed to it would, if they were considered, support a claim for unjust enrichment against JJJ. Plaintiff's affidavit cannot, however, be considered on this motion to dismiss. The eleventh claim for unjust enrichment is thus dismissed as to JJJ, without prejudice to a motion for leave to amend the complaint in regard to this claim.

### 4) Claims against RCDS II

The plaintiff seeks recovery from RCDS II on the third through twelfth claims in the Amended Complaint. RCDS II seeks to dismiss these claims against it on the ground that "all of the causes of action are grounded in the simple assertion that RCDS II is the 'successor-in-interest' to RCDS I." (Defs.' Mem. in Supp. p. 6.)

While it is true that the Amended Complaint includes few allegations concerning RCDS II, and that the allegation that RCDS II is the successor in interest to RCDS, Inc. is not a factual conclusion, but rather a legal conclusion, Plaintiff's allegations are sufficient to withstand Defendants' motion to dismiss these claims.

The complaint alleges that Kanas "obtained the equivalent security [for] the Kanas loan from RCDS II as had been obtained from RCDS Inc. (the predecessor-in-interest to RCDS II)." (Amend. Compl.¶ 102.) The allegation that Kanas was able to get the same security from RCDS II that he had previously received indirectly from RCDS amounts to an allegation that RCDS II acquired the assets of RCDS, Inc. RCDS II could not have conveyed assets held by RCDS, Inc. if RCDS II did not own those assets. That alone does not, however, necessarily make RCDS II a successor in interest to all of RCDS, Inc.'s liabilities.

■ A corporation that acquires the assets of another corporation does not automatically assume the liabilities of the predecessor corporation. *See Lumbard v. Maglia, Inc.,* 621 F.Supp. 1529, 1534 (S.D.N.Y.1985). Liability is assumed only if one of four criteria is met: (1) the successor corporation either expressly or impliedly agrees to assume the predecessor's liabilities; (2) the transaction is a de facto merger; (3) the successor may be considered a mere continuation of the predecessor; or (4) the transaction is fraudulent. *See id.; see also Town of Oyster Bay v. Occidental Chem. Corp.,* 987 F.Supp. 182, 205 (E.D.N.Y.1997) (analyzing successor liability in CERCLA context). The plaintiff argues that the de facto merger and/or the mere continuation theories apply under these circumstances.

■ For a de facto merger to occur, there must be continuity of the successor and predecessor corporations, as evidenced by: "(1) continuity of ownership; (2) a cessation of ordinary business and dissolution of the predecessor as soon as prac-

tically and legally possible; (3) assumption by the successor of the liabilities ordinarily necessary for the uninterrupted continuation of the business of the predecessor; and (4) a continuity of management, personnel, physical location, assets, and general business operations." *Lumbard,* 621 F.Supp. at 1535. Not all of these factors are necessary to demonstrate a merger; rather "these factors are only indicators that tend to show a de facto merger." *Id.* Here, enough of the factors are alleged or may properly be implied from the Amended Complaint to indicate that a de facto merger may have occurred.

■■■ The allegations in the Amended Complaint can be read to imply that RCDS II is a continuation of the enterprise of RCDS, Inc. in terms of assets, management, physical location, (Amend. Compl.¶ 103), and general business operations (both entities are alleged to operate as elementary schools). *(See id.* ¶ 8.) The complaint also alleges that Kanas "directed the filing of a certificate of dissolution by RCDS, Inc. on or about October 8, 1998, following the incorporation of RCDS II." *(Id.* ¶ 101.) Indeed, the defendants include, as exhibits in support of their motion to dismiss, a copy of the Certificate of Dissolution, filed on October 8, 1998 and a copy of the Provisional Charter of RCDS II, granted on September 18, 1998. (Raynor Reply Affirm. Exs. B & C.) Plaintiff's allegations concerning the factors that indicate a de facto merger are sufficient to survive Defendants' motion to dismiss. The plaintiff has given RCDS II a " 'short and plain statement of the claim' that will give the defendant fair notice of what plaintiff's claim is and the ground upon which it rests," and the claims against RCDS II should not be dismissed. *Conley,* 355 U.S. at 47, 78 S.Ct. 99 (quoting Fed. R. Civ. P. 8(a)).

## III. SUMMARY OF CONCLUSIONS

### A. Plaintiff's Cross–Motion for Summary Judgment

Summary judgment is DENIED as to the first claim in the Amended Complaint.

Summary judgment is GRANTED to plaintiff Diane Kessenich against defendant Jeanne Raynor:

1) On the third through seventh claims in the Amended Complaint, the principal amount of $717,625.77, plus a penalty of $35,880.29, plus interest as allowed by law, plus costs and reasonable attorney's fees incurred in recovering those sums.

2) On the ninth and tenth claims in the Amended Complaint, the principal amount of $26,000.00, plus a penalty of $1300.00, plus interest as allowed by law, plus costs and reasonable attorney's fees incurred in recovering those amounts.

Counsel for plaintiff is directed to submit an application for interest, costs and attorney's fees.

### B. Defendants' Motion to Dismiss

Defendants' motion to dismiss is GRANTED as to the following claims:

1) Plaintiff's eleventh claim for unjust enrichment against defendant Jeannie's Junior Jungle, Inc., without prejudice to a motion for leave to replead;

2) Plaintiff's thirteenth claim for equitable subordination against defendant John Adam Kanas, with prejudice; and

Defendants' motion to dismiss is DENIED as to the following claims:

1) Plaintiff's twelfth claim for imposition of a constructive trust;

2) Plaintiff's twelfth claim for an equitable lien;

3) Plaintiff's fourteenth claim for tortious interference against Blake;

4) Plaintiff's fourteenth claim for tortious interference against Kanas;

5) Plaintiff's claims to the extent that Plaintiff seeks to impose liability

against RCDSII as the successor in interest to RCDS.

It is so ordered.